John J. Nelson (SBN 317598)
jnelson@milberg.com
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
280 S. Beverly Drive
Beverly Hills, CA 90212
Telephone: 858.209.6941
Fax: 865.522.0049

Daniel O. Herrera
dherrera@caffertyclobes.com
Nickolas J. Hagman
nhagman@caffertyclobes.com
**CAFFERTY CLOBES
MERIWETHER & SPRENGEL LLP**
135 S. LaSalle Street, Suite 3210
Chicago, IL 60603
Telephone: 312-782-4880
Fax: 312-782-4485

*Attorney for Plaintiff and the Putative Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Adrienne Allen, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>Xandr, Inc.,<br><br>Defendant. | CASE NO:<br><br>CLASS ACTION COMPLAINT<br><br>1. INVASION OF PRIVACY;<br>2. VIOLATION OF THE CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT, CALIFORNIA PENAL CODE § 502;<br>3. VIOLATION OF CALIFORNIA PENAL CODE § 631;<br>4. VIOLATION OF CALIFORNIA PENAL CODE § 632.7;<br>5. RESTITUTION<br><br>JURY TRIAL DEMANDED |

Class Action Complaint

1.    Adrienne Allen ("Plaintiff"), individually and on behalf of all other similarly situated California residents ("Class Members"), brings this class action for damages and injunctive relief against Xandr, Inc. ("Xandr" or "Defendant") , and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, related entities for violations of the California Constitution, Article I, Section 1; the California Computer Data Access and Fraud Act ("CDAFA"); California Penal Code § 502; the California Invasion of Privacy Act ("CIPA"); California Penal Code § 630, *et seq.*, including Sections 631, and 632.7; and restitution, in relation to the unauthorized collection, recording, and dissemination of Plaintiff's and Class Members' personal information, geolocation data, and communications. Plaintiff makes these allegations on information and belief, with the exception of those allegations that pertain to Plaintiff, which Plaintiff alleges based on her personal knowledge and investigation conducted by her attorneys.

## NATURE OF THE CASE

2.    The efforts of privacy-conscious individuals to avoid the improper collection and storage of personal information—particularly sensitive personal information—must be protected. As the Supreme Court recognized in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), location data is highly sensitive, not just because of what the data point alone says about an individual (*i.e.*, where they were at a particular time), but also because of the massive amount of personal information that can be extracted from location data (such as medical treatment, personal relationships,

and private interests). As Chief Justice John Roberts stated, "a cell phone—almost a 'feature of human anatomy[]'—tracks nearly exactly the movements of its owner. . .. A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales," and when a third-party has access to the information stored on one's cell phone, that entity "achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user." *Id.* at 2218 (internal citations omitted).

3.       Unsurprisingly, given corporate America's unquenchable thirst for consumer data to better market their product to consumers, data brokers—entities that collect, aggregate, use and/or sell consumer data for a variety of purposes—have found ways to intercept and profit from the location data that cell phones constantly generate, placing in jeopardy the privacy of every American.

4.       Xandr, Inc., formerly known as AppNexus, Inc., and, since 2022, a wholly owned subsidiary of the Microsoft Corporation, is one such company.

5.       Xandr has for years published and made available to software developers for free a custom software development kit ("SDK") known by a variety of different names and currently marketed as the Xandr SDK. Software development kits ("SDKs") are pre-code software bundles that mobile application ("app") developers often use to minimize development work (instead of writing the entire app code from scratch).

6.       Through its SDK, Xandr has for years surreptitiously collected a wealth of information about consumers and their mobile devices by intercepting data (including

mobile device IDs) that consumers communicate to mobile-phone applications that have incorporated the SDKs. That data includes *precise* location data that reflects a mobile device user's physical location (latitude and longitude coordinates)[1].

7.    This precise location data is collected from the mobile device when the user uses an app built using the Xandr SDK through both reverse IP lookup[2] and/or through the GPS on the mobile device.

8.    App developers embed into their apps SDKs that developers did not themselves create and, therefore, may not know the full extent and function of the code in the SDK. Many SDKs, including the Xandr SDK, surreptitiously siphon consumers' time-stamped location and other data directly to entities like Defendant, which then use that location data to micro-target consumers and deliver curated advertisements for the benefit of their advertising clients and their own bottom line.

9.    Defendant's monetization potential is further enhanced by the ease with which consumers' geolocation data can be de-anonymized since the location data the SDK intercepts is collected alongside and associated with additional data, including a mobile advertising ID ("MAID") unique to every mobile device. Indeed, in 2013, researchers published in the Scientific Journal a study concerning their analysis of 15 months of human mobility data like that collected and monetized by Xandr. They

---

[1]    https://learn.microsoft.com/en-us/xandr/monetize/how-geography-targeting-works (last accessed September 20, 2024).

[2]    A process by which the geographical location of an internet-connected device is identified by querying databases that map IP addresses to specific locations.

Class Action Complaint

concluded that even absent an "obvious identifier" like a name, addresses or a device ID, "if an individual's patterns are unique enough, outside information can be used to link the data back to an individual" and "that the uniqueness of human mobility traces is high and that mobility datasets are likely to be identifiable using information only on a few outside locations."[3]

10.     In other words, even data that lacks an identifier particular to a given individual can be de-anonymized with minimal effort. The device-specific location data Xandr collects and utilizes without consumers' consent thus poses **even greater** risks to consumers themselves because it is not anonymized and can be combined with various unique mobile device identifiers to identify the mobile device's user or owner.

11.     The FTC has recently brought enforcement actions against several entities that utilize SDKs similar to the Xandr SDK, alleging that the technology "collects sensitive information from consumers, including where they live, where they work, where they worship, where their children go to school or obtain child care, where they receive medical treatment (potentially revealing the existence of medical conditions), where they go to rallies, demonstrations, or protests (potentially revealing their political

---

[3]Yves-Alexandre de Montjoye, César A. Hidalgo, Michel Verleysen & Vincent D. Blondel, *Unique in the Crowd: The privacy bounds of human mobility*, Scientific Reports volume 3, Article number: 1376 (2013), available at https://www.nature.com/articles/srep01376.

Class Action Complaint

affiliations), and any other information that can be gleaned from tracking a person's day-to-day movements."[4]

12.   The FTC's concerns regarding disaggregated location data are not mere hyperbole; they are concrete and particularized, as are the risks posed by the surreptitious collection and sale of location data.

13.   For example, in 2018, *The New York Times* was able to use purportedly "anonymous" location data to follow multiple people into abortion clinics, follow them inside, and unmask them. As part of the investigation, the article's authors reviewed a database of data collected by one app data collector and determined that the data revealed locations that individuals visited to within a few yards.[5]

14.   Likewise, *The Pillar*, a Catholic Substack publication, successfully outed a homosexual priest using location data purchased from a data exchange like Xandr. Although the data was not associated with names or particular addresses, investigators isolated location data from a dating app, Grindr, showing that the device was frequently found at the priest's residence. By cross-referencing that device ID with other locations known to be frequented by the priest, investigators were able to confirm the device ID

---

[4]   *In the Matter of InMarket Media, LLC*, available online at https://www.ftc.gov/system/files/ftc_gov/pdf/Complaint-InMarketMediaLLC.pdf (last accessed September 27, 2024).

[5]   Jennifer Valentino-DeVries et al, *Your Apps Know Where You Were Last Night, and They're Not Keeping it Secret*, New York Times (Dec. 10, 2018), available at: https://www.nytimes.com/interactive/2018/12/10/business/location-data-privacy-apps.html?mtrref=www.vice.com&gwh=3919FC4278D0708838A67ACD4CF87224&gwt=pay&assetType=PAYWALL.

1    was associated with the priest, and that his mobile device frequently visited gay bars

2    and private residences associated with other Grindr users.[6]

3        15.    Mobile device data, such as the kind that Xandr surreptitiously collects

4    from consumers, can be used to identify specific individuals—even without information

5    such as the person's name or address—and determine specific locations that the

6    individual visited, all without informing or obtaining consent from the person tracked.

7    **CALIFORNIA VIGOROUSLY PROTECTS INDIVIDUALS' PRIVACY**

8        16.    The California Constitution recognizes the right to privacy inherent in all

9    residents of the State and creates a private right of action against private entities that

10    invade that right.

11        17.    Article I, Section 1 of the California Constitution provides: "All people are

12    by nature free and independent and have inalienable rights. Among these are enjoying

13    and defending life and liberty, acquiring, possessing, and protecting property, and

14    pursuing and obtaining safety, happiness, and privacy."

15        18.    The right to privacy was added to the California Constitution in 1972,

16    through Proposition 11 (called the "Right to Privacy Initiative"). Proposition 11 was

17    designed to codify the right to privacy, protecting individuals from invasions of privacy

18    from both the government and private entities alike: "The right of privacy is the right to

19    be left alone. It is a fundamental and compelling interest. . . . It prevents government

20    
        _____

21    [6] Joseph Cox, *The Inevitable Weaponization of App Data is Here*, Vice (July 21, 2021),
available    at:    https://www.vice.com/en/article/pkbxp8/grindr-location-data-priest-
weaponization-app.

and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information." Ballot Pamp., *Proposed Stats. and Amends. to Cal. Const. with arguments to voters*, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27; *see also Hill v. Colorado*, 530 U.S. 703, 716 (2000) (the right to privacy includes right to be free in one's home from unwanted communication); *Hill v. National Collegiate Athletic Assn.*, (1994) 7 Cal.4th 1, 81, (Mosk, J., dissenting).

19.    The California State Legislature passed CIPA in 1967 to protect the right of privacy of the people of California, replacing prior laws that permitted the recording of telephone conversations with the consent of one party to the conversation.

20.    The California legislature was motivated to enact CIPA by a concern that the "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

21.    The California Penal Code is very clear in its prohibition against unauthorized tapping without the consent of the other person: "Any person who, by means of any machine, instrument, or contrivance, or any other matter, intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire,

line, cable, or instrument, including the wire, line, cable. Or instrument of any internal telephonic communication system, or who willfully and without consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state [violates this section]." Penal Code § 631(a).

22.     Defendant makes an unauthorized connection with Plaintiff's and Class Members' mobile devices when it collected and stored their personal information, geolocation data specific to each consumer's mobile device as well as other behavioral data, and then utilized such information for the purposes of targeted advertising.

23.     Defendant collected and monetized Plaintiff's and Class Members' precise geolocation data which could be linked to visits to sensitive locations without Plaintiff's and Class Members' knowledge or consent. These actions cause or are likely to cause substantial injury to Plaintiff and Class Members which are not outweighed by any benefits to the consumer or competition.

24.     Plaintiff brings this action for violations of Plaintiff's and Class Members' right to privacy, both under common law and under the California Constitution; CDAFA; and for every violation of California Penal Code § 631, which provides for statutory damages of $2,500 for each violation, pursuant to California Penal Code § 631(a); Penal Code § 637, which provides for statutory damages of $5,000 for each violation under Penal Code § 637.2; violations of the UCL; and for unjust enrichment.

Class Action Complaint

25. Unless otherwise stated, all the conduct engaged in by Defendant took place in California.

26. All violations by Defendant were knowing, willful, and intentional, and Defendant did not maintain procedures reasonably adapted to avoid any such violation.

27. Unless otherwise indicated, the use of Defendant's names in this Complaint includes all agents, employees, officers, Members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of the named Defendant.

## JURISDICTION & VENUE

28. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more Class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States. This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

29. This Court has specific personal jurisdiction over Defendant Xandr, Inc. because it is registered to conduct business in California, has purposefully availed itself of the benefits and protections of California by conducting continuously and systematically conducting substantial business in this judicial district and directing advertising and marketing materials to districts within California.

Class Action Complaint

1    30.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391

2    because Defendant transacts business in this District and is therefore subject to personal

3    jurisdiction in this District.

4                                              **PARTIES**

5    31.    Plaintiff Adrienne Allen is, and at all times mentioned herein was, a natural

6    person and resident of the State of California who is domiciled in Perris, California.

7    32.    In late 2023, Plaintiff Allen began using the Medisafe Pill & Med

8    Reminder application ("Medisafe") on her iPhone to help her manage her medication

9    intake. Since then, Plaintiff Allen has been using the app on a daily basis and it has been

10   persistently running in the background on her phone.

11   33.    Medisafe required Plaintiff Allen to create an account before she could use

12   the app, so she registered an account with Medisafe using her email address.

13   34.    Completely unknown to Plaintiff Allen, however, is that Medisafe is built

14   using the Xandr SDK. And through the lines of code embedded in the Medisafe app,

15   Xandr tracks her geolocation, and monitors and intercepts communications related to

16   her use of the app including information regarding, *inter alia*, her medication intake.

17   35.    Plaintiff values her privacy, as most people do. Even when Plaintiff turned

18   the location tracking off on her mobile device, Xandr's SDK nevertheless continued to

19   track her movements and collect and transmit information she entered into the app.

20   Xandr then combined this valuable private information with other data sets to send to

21   Xandr for advertising, sales, and marketing purposes against her wishes.

11

Class Action Complaint

36.     Plaintiff did not know until recently that her, movements, locations, and information regarding her medicine intake were being tracked and monetized by Defendant so it or its customers could market, sell, and advertise to her.

37.     Defendant Xandr, Inc. is a Delaware corporation with its principal place of business located at 1 Rockefeller Plaza. New York, NY, 10020.

38.     Upon information and belief, Xandr made the Xandr SDK available to app developers who, in turn, embedded the SDK's code in apps installed on Plaintiff's cellular telephone. Thereafter, the Xandr SDK began intercepting, receiving, and collecting location data and other myriad data points from Plaintiff's cellular telephone. This information was then transmitted to Xandr and, in combination with other data points it has obtained about Plaintiff, to create a profile of Plaintiff's physical locations, device IDs, and consumer behavior, monetized through the Xandr Platform.

## FACTUAL ALLEGATIONS

## **Online Advertising Basics**

39.     In traditional offline advertising, a company creates an ad campaign and purchases advertising slots on different kinds of media (*e.g.*, television, magazines and newspapers, and on roadside billboards).[7] Online advertising fundamentally functions in the same way, but with a more complex web of involved parties: [8]

---

[7]     https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

[8] *Id.*

Class Action Complaint

## Different parties involved in online advertising

Many different parties interact in the online advertising ecosystem:

- **Publishers** (sellers) provide inventory, or the space where ads are displayed. This may be a website or a mobile app. For example, www.nytimes.com⧉, www.cnn.com⧉ and www.imdb.com⧉ are all publishers who sell ad space.
- **Advertisers or marketers** (buyers) purchase inventory for the display of advertisements. For example, Microsoft, Amazon, and Target are all advertisers.
- **Ad networks** serve as brokers between groups of publishers and groups of advertisers. Networks traditionally aggregate publishers and advertisers and also handle remnant inventory, but they can have a wide variety of business models and clients.
- **Users** are the target customers for advertisements.
- **Data providers** provide information useful for targeting. This can be contextual information about the web site or web page where the ad is displayed (for example, you wouldn't want to display a vacation ad next to a newspaper article about a plane crash), behavioral data about users, viewability data about advertisements, or other kinds of data.
- **Data management platforms (DMPs)** are centralized systems for gathering first-party data, integrating with third-party data, and applying this data to one's advertising strategy. A DMP may offer the following features: estimating the likely reach for a user segment, measuring the lift from using data, acting as a financial clearing house between data buyers and sellers, and assisting publishers in monetizing data on their users. DMPs most commonly work with user data but may also work with contextual data, or other types of data. For example, Sizmek and Rocket Fuel are large DMPs.
- **Demand side platforms (DSPs)** enable advertising clients to buy digital media on many different selling networks, exchanges, and platforms through a single interface. For example, Xandr, ONE by AOL, Rocket Fuel, and Turn can act as DSPs.
- **Supply side platforms (SSPs)** enable publishers to access demand from many different networks, exchanges, and platforms through a single interface. For example, Xandr, Liverail, OpenX, and Pubmatic can act as SSPs.
- **Rich media vendors** create, serve and manage rich media advertising. Rich media refers generally to advertisements with audio, video, or other interactive elements.

Publishers, advertisers, and networks interact through unified ad trafficking systems called **ad exchanges**. An ad exchange allows advertisers and publishers to use the same technological platform, services, and methods, and "speak the same language" in order to exchange data, set prices, and ultimately serve an ad. Major ad exchanges include DoubleClick, OpenX, Facebook's FBX, and Xandr.

*Figure 1: Screenshot of Xandr's ad servicing page denoting which parties are involved in online advertising.*

40.     An ad exchange[9] is a digital marketplace that enables advertisers and publishers to buy, sell, and display video and mobile ad inventory. Ad inventory refers to digital spaces than can display ads, such as places for banner ads on the margins of webpages, video ads that play before and after online videos, and pop-up ads on mobile and computer applications. The entities that control these mediums: website publishers,

---

[9] Typically, ad exchanges integrate supply side platforms, demand side platforms, and data management platforms.

13

video hosting services, and mobile application developers sell this ad inventory to entities looking to advertise. Virtually anyone looking to place any kind of advertising (for products or political and social causes, for example) can buy inventory from an ad exchange, typically using demand-side platforms, and ads are then delivered directly to devices and other advertising spaces made available by publishers through a supply-side platform. Ad exchanges, in other words, connect demand with supply in order to facilitate a more specific and individualized approach to ad delivery.

41.    Due to the interactive nature of online media, as opposed to the passive role of a viewer or reader in TV and print advertising, online advertising is often microtargeted to individual website visitors, video viewers, or app users. This targeting is accomplished, in real-time, through a process known as "ad serving" to determine which specific ad is displayed in which inventory, *i.e.*, which ad should be shown to a specific individual at a specific point in time. This process typically uses vast quantities of information collected from consumers, including their physical location at the moment an advertisement is delivered.

42.    An overview of the process is shown below:[10]

---

[10]    https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

## Ad serving overview

Ad serving is the process of determining which advertisement goes in which ad slot on a publisher's webpage or mobile app and then delivering the advertisement.  The computer or group of computers that's responsible for this is called an ad server. Major publishers, networks, and advertisers sometimes have their own ad servers.  Most large ad servers also:

- Choose the ad that will most benefit the advertiser or the publisher, and that meets each party's criteria.
- Record how many ads were served and on what pages or screens.
- Record performance data, for example, whether the ad was clicked on, when the viewer stopped playing a video ad, or if the ad can be tied to a purchase or some other action.
- Funnel performance data back into the matching process.
- Capture and make available user data, which is information about a consumer (user) including browser habits and demographic data.

An ad server can be a publisher's ad server, where the publisher decides who gets the impression, or an advertiser's ad server, where the advertiser decides which creative goes in the slot they have been assigned. Or it can be an intermediary ad server that attempts to maximize the benefit to both sides. Some ad servers are small, in-house decisioning systems, and others are major ad servers used by many clients such as Xandr or Google's various ad serving products.

*Figure 2: Screenshot of Xandr's ad servicing page describing the ad serving process.*

43.    As an example, a company that wishes to advertise women's designer exercise shoes will log-on to an ad exchange and purchase ad inventory from publishers that control websites, video hosting services, and applications that are known, based on data, to be used extensively by women (*e.g.*, the *Glamour* magazine's website, YouTube channel, and app). When it purchases this ad inventory, the company will identify the type of individual that it wishes to target: fashion-minded women with an active lifestyle or interest in fitness. The ad exchange will then utilize data management platforms to begin ad service. So, when a consumer visits the *Glamour* magazine website, the exchange's data management platform will identify that consumer through browser cookies and/or mobile device identifies and pull and combine known data about the consumer (such as their gender, interests, occupation, other websites visited, and media

15

consumed). If for example, the data management platform finds that the consumer is a female, frequently visits fitness websites and watches fitness videos, reads blogs about fashion, and regularly visits a gym (based on collected location data) then the ad exchange will place banner ads for the high-fashion exercise shoes on the website for the consumer to view (and hopefully interact with).

44.    In a typical online advertising campaign, publishers will sell placements with payment based on the number of impressions (when an ad is served through an app, webpage or other media) or conversions (when a user interacts with an ad following an impression).[11] In the example above, the space for banner ads on the *Glamour* website is the placement, the ad exchange placing the ad for the exercise shoes on that space (for the consumer to view) is the impression, and the consumer interacting with that ad (*e.g.*, clicking on it or hovering their mouse pointer over it) is the conversion.

45.    This targeted advertising is all made possible by ad exchanges and their integrated platforms.

[11] *Id.*

Class Action Complaint

## Xandr's History and Unlawful Business Practices

46.    Defendant Xandr has long operated one of the most prominent and profitable ad exchanges which delivers advertising content to connected devices across the world, including mobile devices in the United States.

47.    In or around March 2012, Xandr, then doing business as AppNexus, Inc., developed an eponymous cloud-based software platform that enabled and optimized targeted online advertising.[12]

48.    AppNexus' defining feature was an online auction infrastructure and technology for data management, optimization, financial clearing and support for directly negotiated advertising campaigns.[13] AppNexus provided both a demand-side platform (DSP) and a supply-side platform (SSP) and included ad serving functionalities.[14] AppNexus also integrated with advertising sources including Google's "Authorized Buyers" ad exchange, Magnite, Pubmatic and other aggregators.[15]

49.    In 2018, AT&T purchased AppNexus to utilize the AppNexus platform as the foundation for its own internal online advertising division.[16] After the acquisition,

---

[12] https://web.archive.org/web/20110517201506/http://appnexus.com/about/.
[13]        https://www.prnewswire.com/news-releases/appnexus-officially-launches-ad-platform-fueling-the-real-time-bidding-revolution-in-display-advertising-87460287.html
[14] *Id.*
[15]    *Id.*;   https://www.mediapost.com/publications/article/271701/appnexus-expands-video-buying-adds-new-video-dema.html.
[16]        https://www.businesswire.com/news/home/20180625005372/en/ATT-Acquire-AppNexus

AppNexus was renamed Xandr, and AT&T continued to utilize and develop the vaunted auction-based AppNexus online ad platform.[17]

50.   On June 6, 2022, Microsoft acquired the entirety of AT&T's Xandr division for about USD 1 billion to bolster its own advertising and retail media business.[18] Thereafter, Xandr was referred to as the Xandr Platform.[19]

51.   Throughout Xandr's existence—from its inception as AppNexus to its current identity as a wholly owned subsidiary of Microsoft—one key aspect of Xandr's business practices has remained constant: Xandr's use of an SDK to maximize its profits and further its reach into the growing mobile advertising market.

52.   AT&T rebranded AppNexus as Xandr and its SDK as the "Xandr SDK" solely for marketing purposes. Accordingly, for all intents and purposes, the Xandr SDK and AppNexus SDK are one and the same.[20] This SDK has been continuously

---

[17]   https://www.adexchanger.com/digital-tv/atts-xandr-officially-combines-its-tv-ad-biz-with-the-appnexus-digital-ad-platform/;   https://www.reuters.com/article/us-at-t-advertising/atts-xandr-launches-ad-buying-platform-for-premium-content-idUSKCN1TB1LJ/.

[18]   https://www.businessinsider.com/microsoft-potential-adtech-acquisitions-that-could-build-advertising-business-2022-6?op=1.

[19] Microsoft also functions as its own publisher through a program known as the Microsoft Audience Network. However, the Microsoft Audience Network can only be accessed through the Xandr Platform via Microsoft Invest. Thus, advertisers that wish to advertise on *any* of Microsoft's digital products can only do so through the Xandr Platform.

[20] In many up-to-date technical documents, the Xandr SDK is still referred to as the AppNexus SDK; the two names are functionally interchangeable.

maintained and updated since its days as the AppNexus SDK throughout the renaming and changes in ownership of its mother company.[21]

53.     Data and communications surreptitiously collected by the Xandr SDK from users' mobile devices has been and remains integral to Defendant's efforts to deliver microtargeted advertising to consumers' mobile devices. Indeed, Xandr emphasizes the centrality of data when touting the strengths of the Xandr Marketplace, boasting that ad buyers can "leverage proprietary data, apply third-party data, or layer on first-party data" and increase ad efficiency.[22]

54.     The Xandr SDK is made available to app developers for use in Android, iOS, Microsoft Xbox, Microsoft Connected TV, and various computer applications. And when this SDK is used in the app development, Xandr code will be embedded into the application codebase. Once so embedded, the code and the application will integrate with the Xandr Platform in real time.

55.     But while the Xandr SDK is made available to developers *for free*, its use comes at a cost to the users of the apps in which the SDK is surreptitiously embedded. When an end user uses an app created with the Xandr SDK, it intercepts and/or collects data and communications that reveal, among other things, the user's exact location based on a reverse IP lookup.

---

[21]             https://github.com/appnexus/mobile-sdk-android/releases?page=12; https://learn.microsoft.com/en-us/xandr/mobile-sdk/android-sdk-release-notes; https://learn.microsoft.com/en-us/xandr/mobile-sdk/ios-sdk-release-notes.
[22]     https://about.ads.microsoft.com/en-us/solutions/xandr/xandr-marketplace-global-access-premium-supply-demand (last accessed September 27, 2024).

Class Action Complaint

56.    Xandr surreptitiously and without consent intercepts and collects Plaintiff's and Class Members' activity while using smartphone applications that have installed its Xandr SDK on mobile devices.

57.    This data interception and/or collection includes myriad categories of highly sensitive, person information, including but not limited to Plaintiff's and Class Members': IP addresses; browser and device information; the search terms that resulted in that user clicking on a particular advertisement as well as other user-specific communications with the application; user names, IDs and emails, as well as their gender (where available through the app); and the user's activities within the app.[23]

**Information Xandr collects**

When you (an end user) visit a Digital Property that has integrated our Platform or that uses technology that integrates with our Platform, we collect certain information about you and your device. We may also receive personal data about you from our clients and data providers, as noted below. This policy refers this information as "**Platform Data**", and includes the following:

- **Information about your browser** including: the type of browser you use, browser language, browser settings, and cookie information. This may include data about you related to bid requests and an ad impressions, which is collected when we decide to show you an ad on a Digital Property and when we deliver an ad.
- **Information about your device** including device operating system version, connection type, device make, device model, device identifiers such as your IDFA or AAID, and the IP address from which the device accesses a client's Digital Property.
- **Location information** when location services have been enabled for an app on your device that has integrated our technology or where an app or other Digital Property sends that information to our Platform. Additionally, we may derive location information from your device's IP address.
- **Information about your activity on a Digital Property** such as browsing history, viewing history, search history and information regarding an individual's interaction with an internet website, app, or advertisement, including the time web pages or apps were visited or used, and in-game or online viewing activity (e.g., videos viewed, pages viewed).
- **Inferences or audience segmentation derived from Platform Data** or provided by affiliates, clients, or third parties, such as individual profiles, preferences, characteristics, and behaviors.
- **Information about ads served, viewed or clicked on**, including the type of ad, where the ad was served, whether you clicked on it and whether you visited the advertiser's website or downloaded the advertiser's app.
- **Information about your internet service** including information about which internet service provider is used by you.
- **Hashed email addresses** (or other information derived from such).
- **Sensitive personal data about you**, collected from your device or provided by affiliates, clients, or third parties, including:
  - Precise location data from your device or derived from your device's IP address;
  - Inferences or audience segmentation provided by affiliates and third parties, such as individual profiles, preferences, characteristics, or behaviors relating to your:
    - Racial or ethnic origin;
    - Religious or philosophical beliefs;
    - Union membership;
    - Health; or
    - Sex life or sexual orientation.

*Figure 3: Screenshot of Xandr's privacy policy page listing the types of information it collects.*

---

[23] https://about.ads.microsoft.com/en-us/solutions/xandr/platform-privacy-policy.

Class Action Complaint

58.    The most troubling aspect of the Xander SDK's functionality, however, is its interception and/or collection of precise geolocation data. Specifically, the SDK intercepts the user's longitude, latitude, country, state, and city whenever they communicate with an app on their mobile device.[24] The Xandr SDK collects this location data through GPS coordinates if location access is granted to the app and if GPS is enabled on the device. If location access is not granted to the app or if GPS is not enabled on the device, then the Xandr SDK collects this information through reverse IP lookup. In addition to the location data, the Xandr SDK also collects accompanying time-stamp information can be used to determine the *duration* of the user's stay at those coordinates.[25]

59.    The Xandr SDK also collects Android and iOS mobile advertising identifiers, or "MAIDs," (referred to, respectively, as Android Advertising IDs ("AAID") and iOS Identifiers for Advertisers ("IDFA")[26], user identifiers unique to mobile devices at the hardware level.[27]

60.    By designing the Xandr SDK to transmit users' location data, Defendant thus collects highly sensitive information from consumers, including where they live, work, worship, send themselves or their children to school or obtain childcare, receive

---

[24] *Id.*
[25] https://learn.microsoft.com/en-us/xandr/invest/mobile-ad-call-reference.
[26] *Id.*;
https://developers.google.com/android/reference/com/google/android/gms/ads/identifier/AdvertisingIdClient (last accessed September 27, 2024).
[27] *Id.*

21

medical treatment, go to rallies, demonstrations, or protests, and any other information that can be gleaned from tracking a person's day-to-day movements. Xandr collects the foregoing along with several identifiers (including the device ID and MAID).

61.    The geolocation and other categories of personal data collected through the Xandr SDK thus are tracked alongside individually identifiable data points. Xandr can then combine this information with other data points from third parties to create a comprehensive composite of user's physical locations and consumer behavior that is individually identifiable.

62.    Xandr makes it clear that the Xandr Platform uses the information collected by the SDK, which can be easily attributed to specific individuals, for the following ad targeting and analytics purposes:

- **Interest-Based or Targeted Advertising:** Using Platform Data and third party provided data to infer users' demographic characteristics, what users may be interested in, or other relevant traits, and to serve ads to users based on this information. Microsoft and its clients may also use Platform Data to create interest profiles and demographic-related profiles about users;
- **Frequency Capping**: Limiting the number of times users see an ad so users do not see the same ad or type of ad too many times
- **Showing Ads in Sequence**: Showing users ads in a particular order to provide a better user experience
- **Geo-Targeting**: Customizing ads shown to users based on users' current or prior location
- **Contextual Ads**: Showing ads to users based on the content users are viewing
- **Ad Measurement**: Understanding how users respond to ads (e.g., clicking on the ad, visiting an advertiser's website, and downloading an advertiser's app)
- **Aggregated Statistics**: Reporting aggregated statistics regarding, for example, the effectiveness of online advertising campaigns

- **Cross-Device Mapping**: Enabling Cross-Device Mapping (grouping the devices that are likely owned by an individual or household) in order to serve or measure advertising on related devices on behalf of our clients.[28]

63.    Users' location data enables these efforts by making it possible for advertisers to deliver targeted content in the 6.7 billion daily impressions that the Xandr Marketplace serves to individuals.[29]



Figure 4: Screenshot of Xandr's webpage explaining how collected location data is used to target ads to specific individuals.[30]

64.    In sum, Xandr delivers targeted advertising to those consumers while tracking their locations, spending habits, and personal characteristics, and sharing this rich personal data simultaneously with untold numbers of third-party companies by

---

[28] *Id.*

[29]    https://about.ads.microsoft.com/en-us/solutions/xandr/xandr-marketplace-global-access-premium-supply-demand (last accessed September 27, 2024).

[30]    https://about.ads.microsoft.com/en-us/solutions/audience-targeting/location-targeting (last accessed September 27, 2024).

23

1  essentially "fingerprinting" each unique device and user, as well as connecting users

2  across devices and devices across users. [31]

3      65.    By using the users' sensitive geolocation and other personal information

4  in this manner, Xandr benefits from this data by enhancing its ad targeting and

5  performance marketing capabilities. With detailed insights into user behavior, payment

6  patterns, and app interactions, Xandr can offer advertisers and developers more

7  effective ad placements, personalized advertising, and optimized return on ad spend

8  (ROAS). This data-driven approach enables Xandr to maximize advertising revenue

9  and improve the effectiveness of marketing campaigns within its network and directly

10  profit from the location data it collects through the Xandr SDK.

11      66.    The type of information that Xandr collects and the purposes for which it

12  used this information (*e.g.* targeted advertising) has remained consistent through the

13  SDK's existence, regardless of whether Defendant was doing business as Xandr[32] or

14  AppNexus. In short, Xandr has been continuously and systematically collecting and

15  monetizing consumer data, including geolocation data, since 2014.[33]

16  **Xandr's Insufficient Consent Apparatus**

17      67.    Upon information and belief, application(s) containing data collection and

18  transmission code from the Xandr SDK was installed onto Plaintiff and Class members'

19

20  [31] https://about.ads.microsoft.com/en-us/solutions/xandr/platform-privacy-policy.

[32] https://web.archive.org/web/20211118013352/https://www.xandr.com/privacy/platform-privacy-policy/.

21  [33] https://web.archive.org/web/20141215010544/appnexus.com/platform-policy.

Class Action Complaint

cellular telephone. This code intercepts, receives, and records geo-location data from Plaintiff's and Class members' whereabouts, as well as previously described datapoints by intercepting information communicated to mobile device apps, but without Class members' express consent or knowledge.

68.    Users who install apps made with or otherwise integrating the Xandr SDK are not directly informed that their data will be used by Xandr for targeted advertising and marketing purposes. Indeed, most app users have *no idea* their apps incorporate third-party code that intercepts their communications and transmits data back to undisclosed entities.

69.    Even if app developers were to disclose the use of Xandr SDK in their privacy policies, Xandr does *not* require such app users to affirmatively consent to the SDKs use. This means users are not necessarily aware that their interactions with the app contribute to the data that Xandr uses for advertising purposes.

70.    Moreover, the user is not necessarily informed that the Xandr SDK shares this information with the Xandr Platform, where it is exploited and monetized. This is because Xandr does not require app developers utilizing the Xandr SDK to gain user consent for data collection or require app developers to direct users' attention to the Xandr Privacy Policy.

71.    In fact, Xandr makes it clear that they lack any such consent apparatus and place the responsibility for gaining consent entirely on app developers, publishers, other

parties that utilize the Xandr SDK. Xandr, in effect, attempts to wash its hands of the responsibility.[34]

72.     Standing as a concrete example of this problem, Medisafe, which has been downloaded over 5,000,000 times, utilizes the Xandr SDK and collects and transmits location data to the Xandr Platform. However, according to its page on the Google Play app store, it states that it does not share any data with third parties and it does not disclose that it collects location data.[35]

### Xandr's Practices Cause Substantial Injury to Consumers

73.     As described above, the data collected and monetized by Xandr and Microsoft may be used to identify individual consumers and their visits to sensitive locations. The collection and sale of such data poses an unwarranted and unauthorized intrusion into the most private areas of a consumer's life and caused, or is likely to cause, substantial injury to the consumers and their privacy interests.

74.     Additionally, Xandr's practice of obtaining and using additional data and information concerning consumers, alone and in combination with the geo-location data, all without user's consent, is likely to result in consumer injury.

75.     Precise geolocation data associated with device IDs and MAIDs may be used to track consumers to sensitive locations, including places of religion, domestic

---

[34] https://learn.microsoft.com/en-us/xandr/mobile-sdk/sdk-privacy-for-android.
[35] https://play.google.com/store/apps/datasafety?id=com.medisafe.android.client&hl=en_US&gl=US (last accessed September 27, 2024).

26

abuse shelters, places inferring LGBTQ+ identification, medical facilities, welfare and homeless shelters, and reproductive health clinics. Indeed, Xandr directly acknowledges the sensitive nature of this information.[36]

76.    Since each set of coordinates can be effectively time-stamped, Xandr can identify when a mobile device visited a certain location.

77.    Xandr also does not anonymize the location data they collect and monetize, meaning the geolocation data can be combined with the mobile device's device ID, MAID, and even Microsoft account details to identify the user or owner of the device.

78.    If the MAID for a particular device is unavailable to Xandr because tracking has been disabled on the device, it can use other techniques such as digital fingerprinting and other strategies to positively identify the device's user.

79.    Making matters worse for consumers, the location data monetized by Xandr typically includes multiple timestamped signals for each MAID and device ID. By plotting each of these signals of a map, much can be inferred about the mobile device owners. For example, the location of the mobile device at night likely corresponds to the user's home address. This, coupled with other public records, can easily identify the name of the owner or resident of a particular address.

80.    Xandr employs no technical controls to prohibit users of the Xandr Marketplace from identifying consumers or tracking them to sensitive locations.

---

[36] *Id.*

81.     As described above, the data collected, retained, and monetized by Xandr may be used to identify individual consumers and their visits to sensitive locations. The collection and sale of such data poses an unwarranted and unauthorized intrusion into the most private areas of a consumer's life and has caused or is likely to cause substantial injury to consumers.

82.     Furthermore, Xandr's practice of obtaining and using additional data and information concerning consumers, alone and in combination with the geo-location data, all without user's consent, is likely to result in consumer injury.

83.     The dangers associated with Xandr's practices are numerous. For example, the data collected makes it possible to identify a mobile device which visited a reproductive health clinic or can demonstrate a person's routine by showing location data from a particular address, numerous times, in a single week.

84.     Allowing a person access to such information, even for a brief period, can cause substantial injury to the consumers due to the sensitive nature of the information.

85.     Identification of sensitive and private characteristics of consumers from the location data monetized by Xandr injures or is likely to injure consumers through exposure to stigma, discrimination, physical violence, emotional distress, and other harms.

86.     Such injuries are exacerbated by the fact that Xandr's collection and use of location data is completely unknown and/or opaque to consumers: consumers are not informed as to who has collected their location, how it is being used, who that data is

28

being shared with, and how long the data will be retained—let alone provided sufficient information to consent to the interception and use of their data.

87.    Once the information has been collected and stored, the information can be provided to multiple times to companies those consumers have never heard of and never interacted with. Consumers are therefore unable to take reasonable steps to avoid the above-described injuries.

## **Defendant's Unlawful Recording of Communications**

88.    California Penal Code § 632.7(a) is clear in its prohibition against such unauthorized recording of any communications without the consent of all parties to the communication:

> Every person who, without the consent of all parties to a communication, intercepts or receives and intentionally records, or assists in the interception or reception and intentional recordation of, a communication transmitted between two cellular radio telephones, a cellular radio telephone and a landline telephone, two cordless telephones, a cordless telephone and a landline telephone, or a cordless telephone and a cellular radio telephone [violates this section].

89.    California Penal Code § 637.2 permits Plaintiff to bring this action for any violation of California Penal Code § 632.7(a) and provides for statutory damages of $5,000 for each violation.

90.    Defendant recorded or otherwise made an unauthorized connection to Plaintiff's communications in violation of California's statutory and common law against such unlawful intrusions into a person's private affairs, including the California Constitution's prohibition in Article 1, Section 1.

29

91.    This suit seeks only damages and injunctive relief for recovery of economic injury and it expressly is not intended to request any recovery for personal injury and claims related thereto.

92.    Plaintiff is informed and believes, and thereon alleges, that Defendant intentionally recorded a communication transmitted between a cellular radio telephone and a landline telephone without Plaintiff's consent as prohibited by California Penal Code § 632.7(a).

93.    Defendant violated Plaintiff's constitutionally protected privacy rights by failing to advise or otherwise provide notice at the beginning of the recorded communication with Plaintiff that the communication would be recorded, and Defendant did not try to obtain the Plaintiff's consent before such recording.

94.    The recording or other unauthorized connection was done without Plaintiff's prior knowledge or consent. Plaintiff was damaged thereby, as detailed herein, in at least an amount permitted by the statutory damages mandated by California Penal Code § 637.2(a).

95.    Defendant, its employees or agents, secretly recorded a cellular communication made involving Plaintiff and others. At no time before, during, or after any of the communications was Plaintiff warned, told, advised or otherwise given any indication by Defendant, its employees or agents, that the content of her communications were recorded.

Class Action Complaint

96.    As a result, Plaintiff has been damaged as set forth in the Prayer for Relief herein.

97.    Plaintiff seeks statutory damages and injunctive relief under California Penal Code § 637.2.

**<u>Defendant's Unlawful Disclosure of Telephonic Messages</u>**

98.    California Penal Code § 637 prohibits the disclosure of telephonic messages (emphasis added):

> **§ 637. Disclosure of telegraphic or telephonic message; punishment; exception**
>
> Every person not a party to a telegraphic or telephonic communication who **willfully discloses the contents of a telegraphic or telephonic message, or any part thereof, addressed to another person**, without the permission of that person, unless directed so to do by the lawful order of a court, is punishable by imprisonment pursuant to subdivision (h) of Section 1170, or in a county jail not exceeding one year, or by fine not exceeding five thousand dollars ($5,000), or by both that fine and imprisonment.

99.    This suit seeks only damages and injunctive relief for recovery of economic injury and it expressly is not intended to request any recovery for personal injury and claims related thereto.

100.    Plaintiff is informed and believes, and thereon alleges, that Defendant intentionally intercepted, received, recorded and then disclosed Plaintiff's and the other Class Members' telephonic messages, and or parts thereof, while using its software devices on cellular telephones, as prohibited by California Penal Code § 637, and as described further herein.

31

101.  Defendant violated Plaintiff's constitutionally protected privacy rights by failing to advise or otherwise provide notice to Plaintiff that the sensitive and private messages would be disclosed, and Defendant did not try to obtain the Plaintiff's consent before such disclosures.

102.  These disclosures of Plaintiff and Class Members' telephonic messages by Defendant as described further herein was unauthorized and done without their prior knowledge or consent. Plaintiff and the other Class Members were damaged thereby, as detailed herein, in at least an amount permitted by the statutory damages mandated by California Penal Code § 637.2.

103.  As a result, thereof, Plaintiff has been damaged as set forth in the Prayer for Relief herein.

104.  Plaintiff seeks statutory damages and injunctive relief under California Penal Code § 637.2.

### PLAINTIFF'S AND CLASS MEMBERS' INFORMATION AND DATA CONSTITUTE COMMUNICATIONS

105.  The data that Defendant intercepts and transmits, from Plaintiff's and Class Members' mobile devices, directly communicate specific device user decisions, actions, choices, and activities of such users, including but not limited to, their substantive search terms, click choices, purchase decisions and/or payment methods, and more.

106.  Defendant goes beyond simply gathering static information with its SDK but rather actively monitors, intercepts, and records specific user input events and choices that a mobile device user communicates through their mobile device by that

32

user's affirmative actions, such as clicking a link, installing an app, selecting an option, or relaying a response.

107.    Defendant thereafter combines and aggregates these device users' intercepted communications with other data it has gathered about the particular user to create actionable insights for marketing and adverting purposes.

108.    Moreover, the geolocation data that Defendant gathers and combines with all of the other communication information it intercepts is inextricably linked to those communications and is essential in providing context and clarity to those communications.

109.    For example, the fact that a person communicates by selecting a button to purchase a coffee at a ballpark holds an entirely different meaning that if that same person purchases a coffee at an abortion clinic. Likewise, a person ordering a pizza at the beach sends a different communication than if they had ordered that same pizza from a hospice.

110.    Defendant's geolocation tracking is an essential element of the communications which it intercepts and is inseparable from it contextually.

**PLAINTIFF AND CLASS MEMBERS WERE HARMED
BY THE INVASION OF THEIR PRIVACY**

111.    Plaintiff and Class Members are harmed by Defendant's multiple invasions of their privacy.

112.    Defendant obtained personal data, communications, and information about Plaintiffs and Class Members, including Plaintiff's and Class Members' location data.

Class Action Complaint

113.   The data, information and communications that Defendant surreptitiously obtains from Plaintiff's and Class Members' cellphones can and are used by Defendant and the third parties to whom Defendant share Plaintiff's and Class Members' information to identify them and make personalized advertisements to Plaintiff and Class Members individually.

114.   Even when individuals attempt to take affirmative steps to protect their privacy, Defendant designed its SDK to circumvent those efforts. Defendant's SDK continues to track Plaintiff's and Class Members' movements, monitor their application selections, choices, uses, and communications, and combine that valuable private information with other data sets in order to monetize it without their knowledge or consent.

115.   Defendant fails to inform or obtain consent from Plaintiff and Class Members track, collect, obtain, and monetize their data, location history, communications and personal information.

116.   Moreover, the depth and breadth of data and communications that Defendant surreptitiously obtains from Plaintiff and Class Members can be easily used to individually identify Plaintiff and Class Members and their movements and habits. As shown in the articles cited above, including to identify individual's residences, places of employment, and locations they have visited, and such information could be used against, in various manners.

Class Action Complaint

## CLASS ACTION ALLEGATIONS

117.   Plaintiff brings this lawsuit as a class action on behalf of herself and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all those similarly situated. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

118.   Plaintiff proposes the following Class, consisting of and defined as follows:

> **All California citizens who downloaded an app on their personal mobile device that contains code from the Xandr SDK.**

119.   Excluded from the Class are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiff reserves the right to redefine the Class and to add subclasses as appropriate based on discovery and specific theories of liability

120.   **<u>Numerosity/Ascertainability</u>**: The Class Members are so numerous that joinder of all Members would be unfeasible and impractical. The Membership of the entire Class is currently unknown to Plaintiff at this time; however, given that, on information and belief, Defendant accessed millions of unique mobile devices, it is reasonable to presume that the Members of the Class are so numerous that joinder of all Members is impracticable. The disposition of their claims in a class action will provide

substantial benefits to the parties and the Court. The identity of such membership is readily ascertainable from Defendants' records.

121.   **Commonality**: There are common questions of law and fact as to Class Members that predominate over questions affecting only individual Members, including, but not limited to:

A.   Whether Plaintiff and Class Members had a reasonable expectation of privacy under the circumstances;

B.   Whether Defendant's conduct invaded Plaintiff's and Class Members' privacy;

C.   Whether Defendant knowingly accessed Plaintiff's and Class Members' mobile devices;

D.   Whether Defendant knowingly took, copied, or made use of data from Plaintiff's and Class Members' mobile devices;

E.   Whether Defendant had permission from Plaintiff and Class Members to access their mobile devices;

F.   Whether Defendant's SDK constitutes a pen register device;

G.   Whether Defendants' SDK transmits data from Class Members' mobile phones to itself;

H.   Whether Defendants' SDK transmits Class Members' communications to itself;

I.   Whether Defendant intercepted Class Members' communications;

J.   Whether Defendant disseminated information concerning Class Members to third parties;

K.   Whether Defendant disseminated Class Members' communications to third parties;

L.   Whether Defendant recorded Plaintiff's and Class Members' communications; and

M.   Whether Plaintiffs are entitled to restitution.

122.   **Typicality**: Plaintiff's wire and cellular telephone communications were intercepted, unlawfully tapped and recorded without consent or a warning of such interception and recording, and thus, their injuries are also typical to Class Members.

123.   Plaintiff and Class Members were harmed by the acts of Defendant in at least the following ways: Defendant, either directly or through their agents, illegally intercepted, tapped, recorded, and stored Plaintiff and Class Members' digital communications, geolocations, and other sensitive personal data from their digital devices with others, and Defendant invaded the privacy of said Plaintiff and Class. Plaintiff and Class Members were thereby damaged.

124.   **Adequacy**: Plaintiff is qualified to, and will, fairly and adequately protect the interests of each Class Member with whom she is similarly situated, as demonstrated herein. Plaintiff acknowledges that she has an obligation to make known to the Court any relationships, conflicts, or differences with any Class Member. Plaintiff's attorneys, the proposed class counsel, are versed in the rules governing class action discovery, certification, and settlement. In addition, Plaintiff's attorneys, the proposed class counsel, are versed in the rules governing class action discovery, certification, and settlement. The proposed class counsel is experienced in handling claims involving consumer actions and violations of the California Penal Code §632.7. Plaintiff has incurred, and throughout the duration of this action, will continue to incur costs and attorneys' fees that have been, are, and will be, necessarily expended for the prosecution of this action for the substantial benefit of each Class Member.

125.   **Predominance**: Questions of law or fact common to the Class Members predominate over any questions affecting only individual Members of the Class. The elements of the legal claims brought by Plaintiff and Class Members are capable of

proof at trial through evidence that is common to the Class rather than individual to its Members.

126. **<u>Superiority</u>**: A class action is a superior method for the fair and efficient adjudication of this controversy because:

A. Class-wide damages are essential to induce Defendant to comply with California law.

B. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct.

C. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims.

D. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.

E. Class action treatment is manageable because it will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would endanger.

F. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy.

127. Plaintiff and the Class Members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is also superior to other available methods because as individual Class Members have no way of discovering that Defendant intercepted and recorded the Class Members' telephonic digital communications without Class Members' knowledge or consent.

128. The Class may also be certified because:

38

A.    The prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

B.    Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Members of the Class as a whole.

129.    The joinder of Class Members is impractical and the disposition of their claims in the Class action will provide substantial benefits both to the parties and to the court. The Class Members can be identified through Defendant's records.

## CAUSES OF ACTION
## COUNT ONE
**Invasion of Privacy**

130.    Plaintiff repeats, re-alleges, and incorporates by reference preceding paragraphs above as if fully set forth herein.

131.    The California Constitution recognizes the right to privacy inherent in all residents of the State and creates a private right of action against private entities that invade that right.

132.    Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

Class Action Complaint

133.   The right to privacy was added to the California Constitution in 1972, through Proposition 11 (called the "Right to Privacy Initiative"). Proposition 11 was designed to codify the right to privacy, protecting individuals from invasions of privacy from both the government and private entities alike: "The right of privacy is the right to be left alone. It is a fundamental and compelling interest. . . . It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information." Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27; *see also Hill v. Colorado,* 530 U.S. 703, 716 (2000) (the right to privacy includes right to be free in one's home from unwanted communication); *Hill v. National Collegiate Athletic Assn.* (1994), 7 Cal.4th 1, 81, (Mosk, J., dissenting).

134.   Plaintiff and Class Members have a legally protected privacy interests, as recognized by the California Constitution, CIPA, common law and the 4th Amendment to the United States Constitution.

135.   Plaintiff and Class Members had a reasonable expectation of privacy under the circumstances, as they could not have reasonably expected that Defendant would violate state privacy laws. Plaintiff and Class Members were not aware and could not have reasonably expected that unknown third party would install software on their mobile devices that would track and transmit their physical location and

Class Action Complaint

communications, and share Plaintiff's and Class Members' personal information with other parties.

136.   Defendant's conduct violates, at a minimum:

A.    The right to privacy in data, communications and personal information contained on personal devices;

B.    The California Constitution, Article I, Section 1;

C.    The California Wiretapping Act;

D.    The California Invasion of Privacy Act; and

E.    The California Computer Data Access and Fraud Act.

137.   Defendant's conduct in secretly intercepting and collecting Plaintiff's and Class Members' personal information, location data, and communications is an egregious breach of societal norms and is highly offensive to a reasonable person.

138.   Defendant's conduct in analyzing, using, and sharing with third parties the personal information and communications that Defendant intercepted and took from Plaintiff's and Class Members is an egregious breach of societal norms and is highly offensive to a reasonable person, and violates Plaintiff's and Class Members' reasonable expectations of privacy.

139.   Plaintiff and Class Members did not consent for Defendant to track, collect, or use their personal information and communications.

140.   As a direct and proximate result of Defendant's invasion of their privacy, Plaintiff and Class Members were injured and suffered damages. Plaintiff and Class Members are entitled to equitable relief and just compensation in an amount to be determined at trial.

41

Class Action Complaint

141.   Plaintiff and Class members are also entitled to restitution for benefits received by Defendant from its illegal conduct.

## COUNT TWO
### Violation of the California Computer Data Access and Fraud Act
### *Cal. Penal Code. § 502*

142.   Plaintiff repeats, re-alleges, and incorporates by reference preceding paragraphs above as if fully set forth herein.

143.   The California legislature enacted the CDAFA with the intent of "expand[ing] the degree of protection afforded to individuals . . . from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a). The enactment of CDAFA was motivated by the finding that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . unauthorized access to computers, computer systems, and computer data." *Id.*

144.   Plaintiff's and Class Members' mobile devices constitute "computers" within the scope of the CDAFA.

145.   Defendant violated the following sections of the CDAFA:

    A.    Section 502(c)(1), which makes it unlawful to "knowingly access[] and without permission . . . use[] any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data;"

    B.    Section 502(c)(2), which makes it unlawful to "knowingly accesses and without permission takes, copies, or makes use of any data from

a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network;"

C.    Section 502(c)(7), which makes it unlawful to "knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network."

146.    Defendant knowingly accessed Plaintiff's and Class Members' mobile devices without their permission by including within the SDK, that Defendant provides to developers, software that intercepts and transmits data, communications, and personal information concerning Plaintiff and Class Members.

147.    Defendant used data, communications, and personal information that it intercepted and took from Plaintiff's and Class Members' smart phones to wrongfully and unjustly enrich itself at the expense of Plaintiff and Class Members.

148.    Defendant took, copied, intercepted, and made use of data, communications, and personal information from Plaintiff's and Class Members' mobile devices.

149.    Defendant knowingly and without Plaintiff's and Class Members' permission accessed or caused to be their mobile devices by installing without Plaintiff's and Class Members' informed consent software that intercepts and/or takes data, communications, and personal information concerning Plaintiff and Class Members.

Class Action Complaint

150. Plaintiff and Class Members are residents of California, and used their mobile devices in California. Defendant accessed or caused to be accessed Plaintiff's and Class Members' data, communications, and personal information from California. On information and belief, Defendant uses servers located in California that allow Defendant to access and process the data, communications and personal information concerning Plaintiff and Class Members.

151. Defendant was unjustly enriched by intercepting, acquiring, taking, or using Plaintiff's and Class Members' data, communications, and personal information without their permission, and using it for Defendant's own financial benefit. Defendant has been unjustly enriched in an amount to be determined at trial.

152. As a direct and proximate result of Defendant's violations of the CDAFA, Plaintiff and Class Members suffered damages.

153. Pursuant to CDAFA Section 502(e)(1), Plaintiff and Class Members seek compensatory, injunctive and equitable relief in an amount to be determined at trial.

154. Pursuant to CDAFA Section 502(e)(2), Plaintiff and Class Members seek an award of reasonable attorneys' fees and costs.

155. Pursuant to CDAFA Section 502(e)(4), Plaintiff and Class Members seek punitive or exemplary damages for Defendant's willful violations of the CDAFA.

44

## **COUNT THREE**
### **Use of a Pen Register or Trap and Trace Device**
### **Cal. Penal Code § 638.51**

156.   Plaintiff repeats, re-alleges, and incorporates by reference preceding paragraphs above as if fully set forth herein.

157.   California Penal Code Section 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

158.   California Penal Code Section 638.51 prohibits any person from using a pen register without a court order.

159.   Defendant's SDK constitutes a "pen register" because it is a device or process that records addressing or signaling information—Plaintiff's and Class Members' location data and personal information—from the electronic communications transmitted by their mobile devices.

160.   Defendant was not authorized by any court order to use a pen register to track Plaintiff's and Class Members' location data and personal information.

161.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members suffered losses and were damaged in an amount to be determined at trial.

## **COUNT FOUR**
### **Violation of the California Wiretapping Act**
### **Cal. Penal Code § 631**

162.  Plaintiff repeats, re-alleges, and incorporates by reference preceding paragraphs above as if fully set forth herein.

163.  At all relevant times, there was in full force and effect the California Wiretapping Act, Cal. Penal Code § 631.

164.  The California legislature enacted the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630, *et seq.*, including the Wiretapping Act, "to protect the right of privacy" of residents of California. Cal. Penal Code § 630.

165.  The California legislature was motivated to enact CIPA by a concern that the "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.*

166.  The California Wiretapping Act prohibits:

> "any person [from using] any machine, instrument, [] contrivance, or in any other manner . . . [from making] any unauthorized connection, whether physically, electronically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable,

46

or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section[.]

167.   Plaintiff's and Class Members' specific user input events and choices on their mobile devices that are tracked by Defendant's SDK communicates the user's affirmative actions, such as clicking a link, installing an app, selecting an option, or relaying a response, and constitute communications within the scope of the Wiretapping Act.

168.   Plaintiff and Class Members are residents of California and used their mobile devices within California. As such, Defendant intercepts, reads, or attempts to read Plaintiff's and Class Members' data, communications, and personal information in California.

169.   On information and belief, Defendant uses servers in California to intercept, track, process, or otherwise use Plaintiff's and Class Members' data, communications, and personal information within California.

170.   Defendant intercepts Plaintiff's and Class Members' communications while they are in transit to and from Plaintiff's and Class Members' mobile devices and the apps, app developers, and cellphone towers; Defendant transmits a copy of Plaintiff's and Class Members' communications to itself. Defendant uses the contents of the communications and monetize them for its own pecuniary gain.

Class Action Complaint

171.   Neither Defendant nor any other persons informed Plaintiff and Class Members that Defendant was intercepting and transmitting Plaintiff's private communications. Plaintiff and Class Members did not know Defendant was intercepting and recording their communications, as such they could not and did not consent for their communications to be intercepted by Defendant and thereafter transmitted to others.

172.   Defendant's SDK constitutes a machine, instrument, contrivance or other manner to track and intercept Plaintiff's and Class Members' communications while they are using their mobile devices.

173.   Defendant uses and attempts to use or communicate the meaning of Plaintiff's and Class Members' communications by ascertaining their personal information, including their geolocation and places that they have visited, in order to monetize Plaintiff's and Class Members' personal information.

174.   At all relevant times to this complaint, Defendant intercepted and recorded components of Plaintiff's and the putative class' private telephone communications and transmissions when Plaintiff and other Class Members accessed Defendant's software via their cellular mobile access devices within the State of California.

175.   At all relevant times to this complaint, Plaintiff and the other Class Members did not know Defendant was engaging in such interception and recording and therefore could not provide consent to have any part of their private telephone communications intercepted and recorded by Defendant and thereafter transmitted to others.

Class Action Complaint

176.   At the inception of Defendant's illegally intercepted and stored Plaintiff's geolocation and other personal data, Defendant never advised Plaintiff or the other Class Members that any part of this sensitive personal data would be intercepted, recorded and transmitted to third parties.

177.   Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

178.   Defendant's use of MAIDs, device IDs, and its SDK are both a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here.

179.   At all relevant times, by using Defendant's SDK as well as tracking Plaintiff's and Class Members' geolocation, Defendant intentionally tapped, electrically or otherwise, the lines of internet communication between Plaintiff and class Members on the one hand, and the specific sites and locations Plaintiff and Class Members visited on the other.

Class Action Complaint

180.   At all relevant times, by using Defendant's geolocation tracking software technology, Defendant willfully and without the consent of all parties to the communication, or in any unauthorized manner, read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and putative class Members, while the electronic communications were in transit or passing over any wire, line or cable or were being sent from or received at any place within California.

181.   Plaintiff and Class Members did not consent to any of Defendant's actions in implementing these wiretaps within its geolocation tracking software. Nor have Plaintiff or Class Members consented to Defendant's intentional access, interception, reading, learning, recording, and collection of Plaintiff and Class Members' electronic communications.

182.   Plaintiff's and the Class Members devices of which Defendant accessed through its unauthorized actions included their computers, smart phones, and tablets and/or other electronic computing devices.

183.   Defendant violated Cal. Penal Code § 631 by knowingly accessing and without permission accessing Plaintiff's and Class Members' devices in order to obtain their personal information, including their device and location data and personal communications with others, and in order for Defendant to share that data with third parties, in violation of Plaintiff's and Class Members' reasonable expectations of privacy in their devices and data.

184.   Defendant violated Cal. Penal Code § 631 by knowingly and without permission intercepting, wiretapping, accessing, taking and using Plaintiff's and the Class Members' personally identifiable information and personal communications with others.

185.   As a direct and proximate result of Defendant's violation of the Wiretapping Act, Plaintiff and Class Members were injured and suffered damages, a loss of privacy, and loss of the value of their personal information in an amount to be determined at trial.

186.   Defendant was unjustly enriched by its violation of the Wiretapping Act.

187.   Pursuant to California Penal Code Section 637.2, Plaintiff and Class Members have been injured by Defendant's violation of the Wiretapping Act and seek damages for the greater of $5,000 or three times the amount of actual damages, and injunctive relief.

## <u>COUNT FIVE</u>
## RESTITUTION

188.   Plaintiff repeats, re-alleges, and incorporates by reference preceding paragraphs above as if fully set forth herein.

189.   Plaintiff and Members of the Class conferred a benefit on Defendant through the use and dissemination of Plaintiff's and Class Members' personal information, geolocation data, and communications.

Class Action Complaint

190.   Defendant received and is in possession of Plaintiff's and Class Members' personal information, geolocation data, and communications, which Defendant used and disseminated for its own monetary benefit.

191.   It is unjust under the circumstances for Defendant to retain the benefit conferred by Plaintiff and Class Members without compensating them. Therefore, Plaintiff and the Class are entitled to restitution for the benefits so conferred.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Adrienne Allen, individually and on behalf of all others similarly situated, requests that this Court:

A.    Determine that the claims alleged herein may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class defined above;

B.    Appoint Plaintiff as the representative of the Class and her counsel as Class counsel;

C.    Award all actual, general, special, incidental, statutory, punitive, and consequential damages, treble damages, and restitution to which Plaintiff and the Class Members are entitled by law;

D.    Award pre-judgment and post-judgment interest on such monetary relief;

E.    Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendant to disclose its practices collecting and disseminating personal information, data, and

Class Action Complaint

1   communications, and to refrain from collecting, retaining, using and

2   disseminating Plaintiff's and Class Members' personal information,

3   geolocation data, and communications without disclosing the full extent of

4   its practices;

5   F.    Award reasonable attorneys' fees and costs; and

6   G.    Grant such further relief that this Court deems appropriate.

7                           **JURY DEMAND**

8   Plaintiff, on behalf of herself and the putative Class demand a trial by jury on all

9   issues so triable.

10   Date: October 3, 2024              Respectfully submitted,

11                              By:    /s/ *John J. Nelson*
                                       John J. Nelson (SBN 317598)
12                                     **MILBERG COLEMAN BRYSON
                                       PHILLIPS GROSSMAN, PLLC**
13                                     280 S. Beverly Drive
                                       Beverly Hills, CA 90212
14                                     Telephone: 858.209.6941

15                                     Daniel O. Herrera*
                                       Nickolas J. Hagman*
16                                     Alex Lee*
                                       **CAFFERTY CLOBES**
17                                     **MERIWETHER & SPRENGEL LLP**
                                       135 S. LaSalle Street, Suite 3210
18                                     Chicago, IL 60603
                                       Telephone: 312-782-4880
19                                     dherrera@caffertyclobes.com
                                       nhagman@caffertyclobes.com
20                                     alee@caffertyclobes.com
                                       *Pro Hac Vice forthcoming*

21                                     *Attorney for Plaintiff and the Putative Class*

Class Action Complaint